v. U.S. 237274. Okay, Mr. Gill, you have a reserved five minutes to return for your bill, correct? Yes, Your Honor. Okay. Good morning, Your Honors. I'm Patrick Gill of counsel at the firm of Senator Travis Rosenberg, representing the appellate Target Corporation. As we've already read our brief, Target appeals the decision of the C.I.T. that it will be liquidation of 40 entries of Target at a rate of 72.29 percent rather than a rate of 9.4 percent at which the entries were entered. The facts are not in dispute in this case and have not been. Commerce issued a preliminary anti-dumping determination at a rate of 9.4 percent. Commerce issued a final determination of anti-dumping duties at 72.29 percent, which was by stipulation of the parties, which did not include Target, and issued instructions to C.P.P. to liquidate at 72. That's sort of a 2.5 rate. That was a settlement rate, right? I'm sorry, Your Honor? The rate that you're talking about, that was a rate that the parties agreed to and settled. Yeah, that was the parties who were part of the action. Yes. Okay. The exporter, Sins Hardware. That rate that was agreed to, it is not a review of that rate as it being a final determination from Commerce. This was a settlement rate, but that was ultimately agreed to by all parties. Yes. Okay. Okay. And Commerce, as a result, issued instructions to customers to liquidate at that rate, and that, of course, did not occur, which is why we are all here. Instead, C.P.P. did not follow those instructions, and ultimately, the entries were liquidated by operation of law six months thereafter, and under 19 U.S.C. 1504B at the 9.4 percent rate. Now, despite the failure to follow... And just so I'm clear, the 9.4 percent rate, was that the cash deposit rate or Commerce's initial... Initial determination. ...administrative review determination? That was the initial determination, yes. Yes. Despite this fact, the entries we owe to liquidation, which we have consistently contended, were final and conclusive upon all parties, absent a following of a protest or challenge, which, of course, did not occur. When the government accorded this attempt to the attention of the court, the C.I.T. ordered the liquidation at the higher rate. Target then filed a notice of intervention for reconsideration into vacay, which were denied in the ultimate decision of the C.I.T. in what we've called Home Products 1, in our briefs. Then Target's appeal of that decision under 1581I was dismissed on procedural grounds by this court in what we called H.P. 2, where the court held... We had brought that action under 1581I. The court said, you have an anatomy of relief under 1581A. That's where you have to go if you want to make this challenge. And that is, of course, what we did. And we filed that challenge. And ultimately, the court issued the decision below, which was a reaffirmation, really, of its decision in Home Products 1, which reaffirmed its earlier decision. And we have submitted consistently that both of those decisions are flatly contrary to the decision in C.L.E.X. S.A., the U.S. theory for a Fed Fund 1314. The unanimous decision of this court in that case affirmed the C.I.T. decision that the liquidations were final and conclusive upon all persons, including the United States, under 1514A. The operative facts in this case and C.L.E.X. are really the same. You have an initial A.D. determination and then a final determination at a higher rate. Liquidation at the lower rate by operation of lower curve. And even though there's still an opportunity for the government to reverse itself, there is no re-liquidation within the 90-day period that is afforded to the government under Section 1501. As a result, the liquidations at that point now became final. All parties were bound by that decision irrespective of the legality under 1518A. Can I ask you this question, which is a follow-up to my question about cash deposit versus initial administrative review. The rate that was mistakenly applied in C.L.E.X., is that how one says it? C.L.E.X. was a cash deposit rate, not an annual review rate initially arrived at by commerce that was later in the C.I.T. corrected to be made higher. In this case, it's the commerce annual review rate that eventually through C.I.T. litigation resulted in a settlement that that rate should be higher. Does that make any difference? I don't think so, Your Honor. At the end of the day, this really comes down to a straightforward question of statutes of limitations and finality of liquidation. And not only did the C.I.T. not follow the binding precedent of this court in C.L.E.X., but the decision in H.P.I. 1 and the companion case below really repudiated the decision of this court in C.L.E.X. Quote, it said, the court cannot understand the logic or reading of that result. And that's in H.P.I. 1 on page 1377. And here it says, why is it difficult to understand its conclusion, which is characterized as unfortunate? The decision below is a failed attempt to resuscitate H.P.I. 1 with an argument that the court had equitable power to enforce its initial judgment. And as we have argued consistently in our briefs, the court certainly has powers in equity and law. But it has no power to disregard the law by using equitable principles. And it has no power to disregard a decision of this court using equitable considerations. At the very end of C.M.E.X., this court suggested that in that particular case, ad hoc could have and should have moved earlier to have the court ensure that the liquidation was being done properly. So it sounded like the court was suggesting that the domestic producer in that case did have some avenue of relief. Well, can you explain why whatever we were suggesting at the very end of the C.M.E.X. opinion couldn't be done under this case, the facts of this case? No, I'm at a loss to distinguish ultimately what happened. Do you understand what I'm referring to the last two paragraphs of the C.M.E.X. opinion? Yeah, precisely what point you're on? Well, first of all, the opinion, I agree with you, seems to quite strongly say that there's a very clear statutory regime here and therefore ad hoc doesn't really have a right to try to get the entries reliquidated under the correct way. But then at the very end of the opinion, it says that this seemingly harsh result was not unavoidable because ad hoc could have heeded the repeated warning signs and should have moved the Court of International Trade to enforce the judgment in 1998 rather than wait until five years later in 2003. So what it appears we're suggesting here is that the domestic producer in this particular case, the C.M.E.X. case, which was ad hoc, could have at some point in time earlier than the time that it did seek a relief from the Court of International Trade. In fact, go to the trade court. Yeah, that possibility exists in this case. But at the end of the day, that did not happen. And that is the ultimate fact that really governs the resolution of this case. Just to be clear, and it didn't happen because it didn't happen fast enough? I don't think the decision hinges on speed. I don't find that anywhere in the opinion. There was no doubt about it, a long period of time versus a short period. Actually, just to, I need to be clear in my mind about some things. The last, Judge Shen was just talking about the very, very important last paragraph of C.M.E.X., which said ad hoc could have done something about this. What it could have done is, even though it wasn't, right, what it could have done is gone back to the Court of International Trade and moved to enforce the original judgment. Could have done that in 1998. That's within the relevant time period. So that seems to suggest that that party, the domestic challenger, could in fact go to the Court of International Trade when it sees that there has been an incorrectly low liquidation. It could do so if it was still within the time period. That's what I mean, it being the timing point. Yeah. So the problem is, for the domestic industry involved in these cases, is it didn't happen within the time period under the law. And at the end of the day, statutes of limitations are there to put a finality. You know, liquidations and everything else that goes up there. Anytime there's a statute of limitations, someone's going to be complaining that they didn't get what they were looking for. That's part of the deal. But when you look at this case, we had the initial litigation that started in 2006. We know we had a decision in 2012, HB1. And then we go on through the subsequent litigation up to today. We're talking about a long period of time. And that doesn't even take into consideration the long administrative period that the case was under consideration by Congress. So what we're talking about is laws that are enacted by Congress that say there's finality. And once we decide these things have to happen within a certain time, that's it. And it's not for the court or anyone else to upset that. Does it matter that this case involves a preliminary injunction, whether that was violated or not? I don't think so. No, I don't think so. Just to be clear, I mean, was there... I'm sorry? Was there an injunction in this case? Or just an order, the CIT's final order on the agreement to the parties that the correct rate was, what, 70% or something? Yeah, 72.29. But there was a preliminary injunction that was still in place, right? And that stays in place until we have liquidation.  And the court properly used executive power over that long period of time when it decided the case to enjoin liquidation until it solved the case. And I think I'm... Tell me if I'm remembering incorrectly. I think that Commerce Instruction to Customs has a little one-line paragraph saying there is not any longer an injunction on your proceeding. I don't recall that, but it may be the case. That would be kind of normal, right? Okay. And finally, the Apolline's arguments citing to other cases which it believes are distinguishable from CMEX, it relies primarily on the Chimney case. But I'll address that in my talk because I see my time on the record is up. Listen. Thank you, Counselor. Your Honors, may it please the Court. Van der Weede? Van der Weede. Van der Weede. Van der Weede. That's the Americanized version. The Dutch version is funnier, but I'm allergic to that. Your Honors, may it please the Court. When CBP in November of 2019 reliquidated Target's entries at the correct 72.29% rate that was ordered by the Court in the Home Products litigation, CBP did not make a protestable decision that could be challenged by Target and obtain relief. In order for there to be a protestable decision, there has to be a decision by Customs. The finality provisions of 1514A hinge on the fact that there's a decision of the Customs Service that's adverse to the importer. But when a Court orders Customs to reliquidate in conformance with its order, there is no decision-making authority on behalf of Customs to ignore that Court order. It has to minister... I'm sorry, but why does that help you? The safety valve referred to in the last paragraph of CMEX was not filing a protest. It was within a short period of time going back to the Trade Corps. Because in CMEX, right, there was a protest... CMEX, CMEX, whatever it may be, there was a protestable decision that the Court found in CMEX, right? So in CMEX, Customs decided that the entries had been liquidated by operation of law, even though they didn't. And it acted upon that decision by posting a bulletin notice. The Court found that because there was that protestable decision, now we're in the realm of finality of 1514A. And 1514A requires that a protest be filed. And just, am I remembering right, that protestable decision was the 2001 acknowledgement of its 1998 action? Yes, the Court found that to be a protestable decision because even though it was an incorrect interpretation by treating the entries as being liquidated, even though they had it, but by treating as such and posting that bulletin notice in CMEX, that became a protestable decision. And now we have a protestable decision under 1514A... And not, I'm sorry, but not protestable by ad hoc? It can't be protestable by ad hoc because it's a domestic industry. And only importers have the protest rights. The domestics didn't. So in that case, domestic couldn't have protested that. Only an importer could have protested that bulletin notice. But the key, the distinguishing... And then the CMEX opinion goes on and says there's also no ability to go through 1516 or 1516A. Right, right. Because otherwise the opinion opines that domestic producers like ad hoc just don't have any means of relief once a customs decision, a customs liquidation goes final. Once it becomes final, until we get to the end of the CMEX decision, where the CMEX court says that it should have brought the issue to the trial court's attention and move to enforce the judgment at the first signs of the issues going wrong with the liquidations. And maybe that was because the 1516A action had not yet concluded in 1998? Well, there's an argument to be made that a 1516A proceeding doesn't end until the liquidations are made in accordance with the court's order. That's what the statute says. Well, that clearly wasn't the way the CMEX court understood the law, right? Right, that's true. I mean, CMEX basically forecloses any theory like that. But CMEX... Remember, there's a protestable decision in CMEX. And the court found that this disposa for triggering the finality provisions and when a protest needs to be filed to challenge that decision by customs. Here, there is no decision by customs. It's only ministerially implementing the court's order. If there's no decision by customs, then those finality provisions of 1514A don't apply. We're not under just these hard and fast time limits. Don't liquidations count as decisions? Liquidations can count as a decision when it's customs at the administrative level that is deciding the rate and classification of duty, appraising the merchandise, all those decisions... And I keep running back to CMEX, trying to... You know, I have to follow precedent here. And it felt like to me that in CMEX, whether it was deemed liquidated or otherwise, what we have here is a decision by commerce. By, I'm sorry, by customs. As, i.e., the liquidation. In CMEX, the decision was the decision to post the Bolton notice to treat the entries other than how they actually are liquidated by treating them as deemed liquidated. Here, there was no decision. That's the distinguishing factor between this case and CMEX. There was no decision by customs. I thought customs read the instructions and said, the way we read the relationship between paragraph two and paragraph five is such that these units actually are not covered by the new 72.29% rate. In this action, no. Customs just made a ministerial error. It liquidated hundreds of entries at the correct negotiated rate of 72. Two and five. One is about exporting. Five is about producers. And then there's a question, I guess, about... I don't think I'm... Am I just making this up entirely? I thought there was some reason to think that customs thought that the producer-only provision, which didn't require the 72.9%. Customs definitely made an error in implementing those instructions incorrectly. But isn't a misinterpretation a decision? But that's not a misinterpretation here. This is just a clerical error. This is a clerical error, a mistake.  They're misreading the instructions. But there's no interpretive function there. Customs doesn't have the authority to change converse's instructions. It doesn't have the authority to contest the court's order in Home Products. Leslie, did you make this, I don't know, interpretive argument about the meaning of decision? We didn't address it as head-on as in retrospect. This is what you're saying now, I guess. I feel like I'm hearing new things that I don't remember reading in your book. This is a more... I don't remember Judge Gordon going on and on about decision in his underlying opinion here. It is a key factor that distinguishes Sonex from this case. Because without a decision, the finality provisions of 1514A don't apply. And remember, it's a... And I'm just confused, just based on the statute. I don't know, you know, there's a lot of decisions the Customs Service apparently does.  Proposed value of merchandise, classification and weight. And then, you know, liquidation or re-liquidation of an entry. Correct. And that's when we're at the administrative level, where Customs is making those determinations. Here, this is, they're making a re-liquidation in response to a court order. The court said, Customs, this is the weight that you need to liquidate at. The Customs Service has no discretion or authority to disobey that order. You can't take an Article III court's order and then at the administrative level just say, well, we're going to ignore it. When is liquidation by Customs and CMAX? Well, but remember, that was a decision. That was treated as a decision in CMAX to post that bulletin notice and treat the entry other than it was. It made a conscious choice to treat it in one way or not. That's what the court found in CMAX. Can you explain? I thought that you all, when you noticed the improperly low rate of liquidation of these units, concluded that you couldn't do anything about it on your own. How does that square with your newish point about there wasn't actually a decision? Well, Your Honor, that's a good point. What happened was, is once the issue came to light, when the domestics found that certain entries weren't being liquidated correctly, that there was an error in how Customs implemented that liquidation order and instructions from Commerce, there is a window under 19 U.S.C. 1501 that, on its own, Customs can make a voluntary reliquidation within a 90-day window. That 90-day window... Of a liquidation, and that's not dependent on decision? So there's an argument to be made that that window doesn't apply when Commerce... I mean, I'm sorry, not Commerce. When Customs is tasked with implementing the court's order correctly, the court ordered it, it needs to be liquidated at this duty rate. So there's an argument to be made that that window doesn't apply, but because that's an unsettled area, what Customs did in this situation is, in an abundance of caution, it said, we're not going to take that action, but we want to bring it to the court's attention. And so once it became part of the court's attention... Wasn't there... Just tell me if I'm wrong about this. I guess my recollection is that there was something more definitive along the lines of, we cannot do this on our own. We need you, the court, to force us to do it. That was in the status report to the court in Home Products, yes. So that's very odd, right? That a court is now ordering the parties to do something that the statute would otherwise bar. Well, I don't think it's the statute would otherwise bar because... Well, according to the status report statement. But the status report statement was just saying, we can't voluntarily do it as an agency, right? I don't understand why those words are any different from, we can't do it voluntarily as an agency because the statute prohibits us from doing it. Your Honor, I agree with you. I think that the Customs shouldn't be barred by that statute within the 90-day window or otherwise of reliquidating in accordance with the court's order. The court tasked it with doing something. It could have done it at any point. I don't think that the 90-day window binds it. I'm just walking back to what the agency was thinking at that time. The way the case comes to us is as a case in which it's accepted, it was accepted at least until oral argument, that the statute prohibited Customs from liquidating at this point. And the court said, but we can force you to do that even though you can't do it by statute on your own. What prior example is there of a court having that power? And I don't mean just the trade court. It would have a constitutional overlay, obviously. Well, when we look at, I mean, we said it in our brief in Peacock and in Heartland, it's just that the court has ancillary jurisdiction. There's an inherent power to enforce its judgments. Contrary even when doing so at that time would be contrary to a statute? But there's nothing contrary to the statute here, though. Because remember that the statute only requires that there's, the statute of 1514A about finality has to do with a protestable decision on Customs' part. If there's no protestable decision by Customs, we're out of the realm of 1514A. And what's left to be done is to reliquidate those entries in conformance with the court's order. That's how 1514A proceeding would have been. 1514 would recognize other statutory exceptions, like 1501, which is Customs can, within 90 days after a liquidation, do a reliquidation on its own. It also talks about the rest of 1514, talks about 1516A, 1516. There's other statutorily designed exceptions to finality. But outside of those exceptions, the statute very clearly says, the liquidation shall be final and conclusive upon all persons, including the United States. And so that's what CMEX worked off of to make the conclusion that it did, that the domestic producer in that particular case just had no way out, or no way in, that is to say, to try to get the original judgment of the rate enforced. And that hinges upon the court's finding that there was a protestable decision in that case. Because that's why 1514A applies in CEMEX, but it doesn't, we submit it doesn't apply here. When you say protestable decision, are you referring to that formal agency procedure by which an importer will formally protest or can choose not to protest liquidation? Right, so let's say at the administrative level, there's an entry that comes in. Customs reviews the entry and finds that the rate and classification of the entry should be X. The importer disagrees and say, no, that's correct. Incorrect, it should be Y. We're going to protest that decision, right? Here, there's a totally different procedural posture, because we're in the realm of... So the familiarity statutory provisions address the protest process. Right. And protestable decisions. And remember, the protestable decisions adverse to the importer, which now the importer is protesting, and then it can summons the denial of that protest to the Court of International Trade. So what if customs here, instead of, you know, doubled the rate by accident? Wouldn't that be a protestable decision? But again, there was no... Would the importer at that point say, wow, you overshot the rate by 100% on protesting? But again, if customs, if they're not making a decision, if they're just... Well, I'm asking you a question. Wouldn't that be a protestable decision? A protestable decision has to be adverse to the importer. I'm identifying an example where it is adverse to the importer. Suppose it had said 140%. Right, right. But again... That's a decision. But obviously incorrect. But why? But this court has long held in other cases that when there's an error in implementing commerce's instructions or court order reliquidating at a certain rate, that's just an error in the ministerial function of customs. That's not a decision. It's protestable. It's only protestable if there's some sort of, you know, action that customs is taking, where it's making some sort of interpretive feats or doing X, Y, and Z. So in Judge Chen's example, customs says, I read this, it says 70%. I hereby liquidate at 140%. That is an error. That is not protestable. What could happen in this case, because again, it's a ministerial error. That's just something that the agency made an error in implementing that. That doesn't mean that there's no path to redress in that situation. We're still talking about this novel argument about how not all liquidations are equal and some liquidations are decisions and other liquidations are not decisions. And I cannot follow it. I don't understand it. If Your Honor would like, I would be happy to provide subliminary briefing on that point. I believe I'm out of time. You're out of time. Thank you. Thank you, Counselor. Mr. Gill, you have five minutes. Thank you, Your Honor. I need to address the key issue that came out of the reply here with regard to liquidation being a decision. A liquidation of an entry is a final decision by customs. It is the quintessential decision that is the subject of virtually all customs protests that end up in the Court of International Trade. It is in the statute itself, 513, liquidation is considered and mentioned specifically as the operative decision that is protestable under 514. So it is pure fiction, in my opinion, to argue that a liquidation is not a decision and therefore not protestable. It is a highly protestable event. And then, if I may, on all the other points which I think Your Honor's got to, whether it's deemed liquidated or otherwise, as Judge Chen pointed out, it clearly doesn't matter. There's two ways these things can get liquidated, by operation of law or by actual physical action taken by customs in liquidating the entries. But at the end of the day, what Congress has said, you've got a period of time to file a protest, and once that period expires, the liquidations, the decisions in liquidation, will enter into that liquidation or file and cover all parties. And again, I would point out the side attempt to distinguish the Shinye case, which was decided only about five months before the CMEX case, held consistently that a decision by Congress is not a protestable event. It's only, and therefore, they got thrown out because they tried to bring an action under 1581i. But what the court said and made very clear is that while a decision by Congress is not protestable, a decision by customs is, and it's the ultimate decision that can be protested. And I'd have to say that distinction in Shinye really answers all of the questions that come up. And the panel that decided that case was Chief Judge Michel and two other judges who were the same judges who decided the CMEX case. So it would be far-fetched to suggest that they were not aware of CMEX and the distinction between what is protestable and what is not protestable. If there are no further questions from the court, I think I've made my piece.